UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KYLE ENDEMANN and
CARRIE ENDEMANN,

                           **Plaintiffs,**

   vs.                                               5:19-CV-1444
                                                        (MAD/ATB)

CITY OF ONEIDA, NEW YORK;
LEO MATZKE, *Mayor, in his*
*individual and official capacity*; JAMES
CHAMBERLAIN, *in his individual*
*and official capacity*,

                           **Defendants.**
_____

APPEARANCES:                                  OF COUNSEL:

TIMOTHY A. BENEDICT, ESQ.          TIMOTHY A. BENEDICT, ESQ.
P.O. Box 448
Rome, New York 13442-0448
Attorneys for Plaintiff

KENNEY SHELTON LIPTAK            DAVID H. WALSH, IV, ESQ.
NOWAK LLP
4615 North Street
Jamesville, New York 13078
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiffs, Kyle and Carrie Endemann, commenced this action against Defendants, the City of Oneida, Leo Matzke, and James Chamberlain, alleging a variety of violations of their constitutional rights and state law. *See* Dkt. No. 2. On January 15, 2020, Defendants moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Dkt. No. 9.

Plaintiff opposed Defendants' motion. *See* Dkt. No. 15. Presently before the Court is Defendants' motion to dismiss the complaint in its entirety. For the following reasons, Defendants' motion is granted in part and denied in part.

## II. BACKGROUND

The conduct at issue began due to a dispute between Plaintiffs and their neighbor, Edward DuBois ("Mr. DuBois"), involving the length of a patch of grass abutting Mr. DuBois' property, a "compost pile" in Plaintiffs' yard, and changes to local ordinances. *See* Dkt. No. 2 at ¶¶ 5-21. Plaintiffs also claim that Defendant Chamberlain, a close friend of Mr. DuBois and a member of the Common Council for the City of Oneida, used his political position to harass Plaintiffs. *See id.* at ¶ 13-22.

Beginning in June 2015, Plaintiffs discarded law clippings and other "green-waste" in a compost pile on their property. *See id.* at ¶ 7. Additionally, in an effort to keep their child, who has autism, from crossing into Mr. DuBois' property, Plaintiffs allowed a strip of grass, measuring approximately eighteen inches wide, to grow between the two properties. *See id.* at ¶ 8. At the time Plaintiffs began these practices, they were not in violation of any local ordinances. *See id.* at ¶¶ 7-8. At some point, Mr. DuBois complained to the Oneida Police Department and the City Code Enforcement Office about the compost pile and grass barrier. *See id.* at ¶¶ 10-11. Plaintiffs allege that in June 2017, Defendant Chamberlain and Mr. DuBois, conspired together to solicit complaints from neighbors about the grass barrier and compost pile. *See id.* at ¶ 15. Plaintiffs claim that they never heard about any of these complaints until August 2019. *See id.* at ¶ 16.

The Common Council for the City of Oneida (the "Council") began to consider changes to local ordinances regarding composting on private property and the permitted height of grass beginning prior to June 2018. *See id.* at ¶ 18. In June 2018, the Council modified the local

ordinances reducing the permitted height of grass and prohibiting composting on private property. *See id.* at ¶ 19. In July 2018, Plaintiffs received a notice of violation citing complaints from neighbors related to the height of their grass and the existence of compost matter. *See id.* at ¶¶ 21-22. Plaintiffs allege that their property was never inspected to determine compliance prior to the issuance of the notice of violation nor were any complaints received by the City after the changes to the ordinances were made. *See id.* at ¶¶ 21, 24. Plaintiffs allege that Defendant Chamberlain, because of his friendship with Mr. DuBois, targeted Plaintiffs and influenced the City to modify local ordinances. *See id.* at ¶ 25. Finally, Plaintiffs allege that on April 2, 2019, Plaintiff Kyle Endemann appeared at a Council meeting to discuss the issues his family had faced, but he was prohibited from speaking. *See id.* at ¶ 27.

Plaintiffs filed this action on October 30, 2019, alleging the following: (1) a Section 1983 equal protection claim against Defendant City; (2) a Section 1983 equal protection claim against Defendant Chamberlain in his individual and official capacities; (3) a Section 1983 equal protection claim against Defendant Matzke in his individual and official capacities; (4) an abuse of process claim against Defendant City; (5) an abuse of process claim against Defendant Chamberlain in his individual and official capacities; (6) an intentional infliction of emotional distress ("IIED") claim against Defendant City; (7) an IIED claim against Defendant Chamberlain in his individual and official capacities; and (8) violation of Plaintiff Kyle Endemann's First Amendment right to free speech by all Defendants. *See id.* at ¶¶ 28-100.

Defendants argue that Plaintiffs' complaint must be dismissed in its entirety for a variety of reasons. *See* Dkt. No. 9. First, Defendants argue that Plaintiffs' equal protection claims must be dismissed because Plaintiffs failed to allege that they were treated differently than similarly situated individuals. *See id.* at 9. In the alternative, Defendants Chamberlain and Matzke argue

3

that Plaintiffs' equal protection claims against them in their official capacities must be dismissed as they are essentially an action against the municipality itself. *See id.* at 12. As for Plaintiffs' First Amendment claims, Defendants argue that all of the claims must be dismissed due to Plaintiffs' failure to allege that Defendants' conduct resulted in a chilling effect on their speech. *See id.* Defendants also argue that Plaintiffs' abuse of process and IIED claims must be dismissed for failure to comply with New York General Municipal Law Section 50-e. *See id.* at 13. In the alternative, Defendants argue that Plaintiffs' IIED claims are time-barred. *See id.* at 15. Finally, Defendants argue that Plaintiffs' abuse of process claims must be dismissed because there was no regularly issued process and the issuance of a notice of violation is not sufficient to sustain such a claim. *See id.* at 16-18.

Plaintiffs responded, consenting to the dismissal of the following claims: (1) the equal protection claims against Defendants Chamberlain and Matzke; and (2) the abuse of process claims against Defendants City and Chamberlain. *See* Dkt. No. 15 at 15. Additionally, without providing any justification, Plaintiffs seek an opportunity to amend their complaint as an alternative to dismissal. *See id.*

### III. DISCUSSION

**A.  Legal Standard**

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not

extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading.[1] *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting [*Twombly*, 550 U.S.] at 557, 127 S. Ct. 1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[,]" *id.* at 570.

**B.    Equal Protection Claims**

---

[1] In addition to the complaint, the Court considered the following documents, which were either appended to or integral to the pleading: the DHR determination and Plaintiffs' complaint to the DHR. *See* Dkt. No. 1-1; Dkt. No. 10-1 at 65-70.

5

The Equal Protection Clause of the Fourteenth Amendment, which provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws," U.S. Const. Am. XIV, § 1, "requires the government to treat all similarly situated individuals alike." *Young v. Suffolk Cnty.*, 705 F. Supp. 2d 183, 204 (E.D.N.Y. 2010) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)). Ordinarily, equal protection claims arise from allegations that the government's classifications "treat certain groups of citizens differently than others." *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 198 (2d Cir. 2019) (internal quotation marks and emphasis omitted). In *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), however, the Supreme Court also recognized "a class-of-one theory for equal protection claims, under which a single individual can claim a violation of [his] Equal Protection rights based on arbitrary disparate treatment." *NRP Holdings LLC*, 916 F.3d at 198 (internal quotation marks omitted).

"Under a 'class of one' equal protection claim, a plaintiff must allege (1) '[he or she] has been intentionally treated differently than others similarly situated' and (2) 'there is no rational basis for the difference in treatment.'" *Young*, 705 F. Supp. 2d at 205 (quoting *Vill. of Willowbrook*, 528 U.S. at 564). "In order to state an equal protection violation under [Section] 1983, 'it is axiomatic that plaintiff must allege that similarly situated persons were treated differently.'" *Id.* at 205 (quoting *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 193 (2d Cir. 1994)). "[T]he standard for determining whether another person's circumstances are similar to the plaintiff's must be . . . whether they are *prima facie* identical." *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008) (internal quotation marks omitted). More specifically, a complaint asserting a class of one claim must allege facts plausibly suggesting that "(i) no rational person could regard the

circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Neilson*, 409 F.3d at 105 (citing *Vill. of Willowbrook*, 528 U.S. at 565); *accord, Fortress Bible Church v. Feiner*, 694 F.3d 208, 222 (2d Cir. 2012); *Ruston v. Town Bd. for Skaneateles*, 610 F.3d 55, 60 (2d Cir. 2010).

Defendants argue that Plaintiffs' Section 1983 claims against all Defendants must be dismissed because Plaintiffs have failed to allege any differential treatment. *See* Dkt. No. 9 at 10. In response, Plaintiffs argue that their allegations that they were "singled out" and "target[ed]," are sufficient to plausibly allege that they were subject to disparate treatment for no legitimate reason. *See* Dkt. No. 15 at 6-7. Plaintiffs cite to *DeMuria v. Hawkes*, 328 F.3d 704, 708 (2d Cir. 2003), to argue that a plaintiff need only generally allege that he was treated differently than similarly situated individuals to plausibly allege a class of one equal protection claim. *See* Dkt. No. 15 at 7-8. However, the *DeMuria* standard was abrogated by the Second Circuit following the adoption of the *Iqbal* and *Twombly* pleading standards. *See Ruston*, 610 F.3d at 59. In *Ruston*, the Second Circuit held that to sufficiently allege a class of one equal protection claim following *Iqbal* and *Twombly*, a plaintiff must provide comparators who are similarly situated. *See id.* at 59-60.

Here, the complaint alleges only that "[u]pon information and belief, the Plaintiffs were the only [people] singled out for grass violations." *See* Dkt. No. 2 at ¶ 31. However, Plaintiff makes no reference to any other similarly situated individuals who were treated differently. Thus, Plaintiffs' pleading as to these claims is deficient. Accordingly, Plaintiffs' equal protection claims against all Defendants are dismissed.

**C.**     **First Amendment Free Speech Claim**

Defendants argue that Plaintiffs' First Amendment claims must be dismissed for failure to allege an actual chilling effect on Plaintiff Kyle Endemann's free speech. *See* Dkt. No. 9 at 12. Defendants appear to assume that Plaintiffs' First Amendment claim is based on retaliation for Plaintiffs' criticism of public officials. *See id.* In their response, Plaintiffs do not dispute Defendants' characterization of their claim as such. *See* Dkt. No. 15 at 9. However, the complaint clearly alleges the government restricted Plaintiffs' ability to speak at a public meeting of the local government. See Dkt. No. 2 at ¶¶ 91-100.

The complaint alleges that Plaintiff Kyle Endemann "appeared at the Common Council meet[ing] to provide comment to the Council during the public comment portion of the meeting." *See* Dkt. No. 2 at ¶ 92. Plaintiffs allege that this portion of the meeting is open to members of the public to speak to the members of the Council. *See id.* at ¶ 94. The complaint further alleges that when Plaintiff Kyle Endemann attempted to speak, he was specifically prohibited from doing so by Defendant Chamberlain. *See id.* at ¶ 95. After Plaintiff was prohibited from speaking, the Clerk read a statement which said that no person was permitted to speak about 214 Driftwood Drive – Plaintiffs' residence. *See id.* at ¶ 96. Finally, Plaintiffs allege that by preventing Plaintiff Kyle Endemann from speaking, Defendants prevented him from exercising his rights to inform the Council and the public about improper actions taken by government officials. *See id.* at ¶ 98. Contrary to Defendants' characterization, this is not a First Amendment retaliation claim. Rather, Plaintiffs allege that Defendants, a municipality and its agents, prevented a citizen from voicing concerns about the actions of government officials in a public meeting of the local government.

"A violation [of the First Amendment] occurs only when constitutionally protected speech is restricted, and the government's justification for the restriction is insufficient." *Frisby v. Schultz*, 487 U.S. 474, 479 (1988). The Supreme Court has set forth a three-step, forum-based

test for determining whether a state actor violated a plaintiff's First Amendment right to free speech. *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788 (1985). A court must determine "(1) whether plaintiff's speech is protected by the First Amendment; (2) the nature of the forum: public, designated or limited public, or nonpublic; and (3) whether the defendant's justifications for limiting the plaintiff's speech satisfy the requisite standard." *Piscottano v. Town of Somers*, 396 F. Supp. 2d 187, 200 (D. Conn. 2005) (citing *Cornelius*, 473 U.S. at 797).

The appropriate level of judicial scrutiny depends on the nature of the forum subject to the regulation. "'Traditional public fora'" are places such as "streets and parks which 'have immemorially been held in trust for the use of the public, and . . . have [generally] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO*, 307 U.S. 496, 515, 59 S. Ct. 954, 83 L. Ed. 1423 (1939)). "Speech finds its greatest protection in traditional public fora, and government may not alter their public status without completely changing the fora's use, *e.g.* converting a public park to an office building." *Make the Road By Walking, Inc. v. Turner*, 378 F.3d 133, 142 (2d Cir. 2004). "Content-based restrictions on speech in traditional public fora are subject to strict scrutiny." *Hotel Employees & Rest. Employees Union Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002) (citations omitted). "The government may, however, impose content-neutral time, place and manner restrictions on speech in a traditional public forum so long as those restrictions are 'narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communications.'" *Id.* (quotation omitted); *see also Make the Road By Walking, Inc.*, 378 F.3d at 142 (citations omitted).

The second category, the designated public forum, "'refers to government property which, although not a traditional public forum, has been "intentionally opened up for that purpose."'" *Hershey v. Goldstein*, 938 F. Supp. 2d 491, 507 (S.D.N.Y. 2013) (quotations and other citation omitted); *see also Perry Educ. Ass'n*, 460 U.S. at 46. "'Because the government, as property owner, has opened up a designated public forum to the same breadth of expressive speech as found in traditional public forums, the same standards apply: Any content-based restrictions on speech must survive strict scrutiny, meaning they must be narrowly tailored to serve a compelling government interest, and content-neutral time, place, and manner restrictions are permissible only if they are narrowly tailored and leave open other avenues for expression.'" *Hershey*, 938 F. Supp. 2d at 507 (quotation and other citations omitted); *see also Int'l Action Ctr. v. City of N.Y.*, 587 F.3d 521, 526-27 (2d Cir. 2009) (citation omitted). Although the government may decide to close a designated public forum, "so long as a forum remains public, government regulation of speech within it 'is subject to the same limitations as that governing a traditional public forum.'" *Make the Road by Walking, Inc.*, 378 F.3d at 143 (quotation omitted).

The third category, the limited public forum, is often analyzed as a subset of the designated public forum and as a nonpublic forum opened up for specific purposes. *See Byrne v. Rutledge*, 623 F.3d 46, 55 n.8 (2d Cir. 2010) ("[T]he law of [the Second Circuit] describes a limited public forum as both a subset of the designated public forum and a nonpublic forum opened to certain kinds of speakers or to the discussion of certain subjects" (internal quotation marks and citations omitted)); *see also N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 128 & n.2 (2d Cir. 1998) (quoting *Travis v. Owego-Apalachin Sch. Dist.*, 927 F.2d 688, 692 (2d Cir. 1991)). A limited public forum is created "'where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects.'"

*Make the Road By Walking, Inc.*, 378 F.3d at 143 (quotations omitted). "Common examples of limited public fora include 'state university meeting facilities opened for student groups, open school board meetings, city-leased theaters, and subway platforms opened to charitable solicitations.'" *Hershey*, 938 F. Supp. 2d at 507 (quotations omitted).

"In limited public fora, strict scrutiny is accorded only to restrictions on speech that falls within the designated category for which the forum has been opened." *Hotel Emps.*, 311 F.3d at 545 (citations omitted). "'Thus, in a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre.'" *Id.* at 545-46 (quotation omitted). If the expressive activity does not fall within the limited category for which the forum has been opened, however, restrictions on speech need only be reasonable and viewpoint neutral. *See id.* at 546 (citations omitted).

The final category, the nonpublic forum, consists of property that "the government has not opened for expressive activity by members of the public." *Hotel Emps.*, 311 F.3d at 546 (citation omitted). Examples of nonpublic fora include airport terminals, government-owned professional sports stadiums, military bases and restricted access military stores, and jailhouse grounds. *See id.* (collecting cases). Restrictions on speech in such fora must only be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n*, 460 U.S. at 46; *see also Cornelius*, 473 U.S. at 800; *Hotel Emps.*, 311 F.3d at 546 ("The government may restrict speech in non-public fora subject only to the requirements of reasonableness and viewpoint neutrality").

Here, Plaintiffs allege that the City of Oneida opened the Common Council meeting up to members of the public to speak to the Council about a number of issues. *See* Dkt. No. 2 at ¶ 94.

Therefore, the council meeting was a limited public forum for the purposes of the First Amendment. *See Anello v. Anderson*, 191 F. Supp. 3d 262, 273 (W.D.N.Y. 2016) (citing *Devine v. Vill. of Port Jefferson*, 849 F. Supp. 185, 189 (E.D.N.Y. 1994)). While the Council was permitted to exclude certain types of speech, once expressive activities of a certain genre were allowed, others of the same genre could not be prohibited. *See Hotel Emps.*, 311 F.3d at 545-46. Making all reasonable inferences in Plaintiffs' favor, as the Court must, it is reasonably likely that the Council had let other members of the public speak on a variety of issues before preventing Plaintiff Kyle Endemann from speaking. Additionally, it is worth noting that only after Plaintiff Endemann began to speak was the statement prohibiting discussion of 214 Driftwood Drive read. *See* Dkt. No. 2 at ¶ 96. This alleged prohibition, however, would not have prohibited Plaintiff Kyle Endemann from voicing concern about the conduct of city officials, as was his intent. *See id.* at ¶ 98. Such speech, which addresses public issues and political matters, could be considered the type that "lies at the heart of protected speech." *Morris v. Lindau*, 196 F.3d 102, 111 (2d Cir. 1999).

The Court finds Plaintiffs have plausibly alleged that Defendants City and Chamberlain selectively denied Plaintiff Kyle Endemann the opportunity to engage in protected speech after allowing speech of a similar genre. *See Hotel Emps.*, 311 F.3d at 545-46. Accordingly, Defendants' motion to dismiss Plaintiff Kyle Endemann's First Amendment claim is denied as to Defendants City and Chamberlain. However, Plaintiffs admit that while Defendant Matzke typically presided over council meetings, he was not present for the meeting at issue. *See* Dkt. No. 2 at ¶ 93. Therefore, Plaintiff Kyle Endemann's First Amendment claim against Defendant Matzke must be dismissed for failure to allege personal involvement. *See Colon v. Coughlin*, 58

F.3d 865, 873 (2d Cir. 1995) (holding that personal involvement of a defendant in an alleged constitutional violation is a prerequisite under Section 1983).

**D.      Intentional Infliction of Emotional Distress Claims**

In order to state a claim for intentional infliction of emotional distress ("IIED") under New York law, the Plaintiff must plead: "(1) extreme and outrageous conduct, measured by the reasonable bounds of decency tolerated by society; (2) intent to cause or disregard of a substantial probability of causing severe emotional distress; '(3) a causal connection between the conduct and the injury; and (4) severe emotional distress.'" *Margrabe v. Sexter & Warmflash, P.C.*, 353 Fed. Appx. 547, 550 (2d Cir. 2009) (quoting *Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001)); see also *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993) (stating the same).  New York law sets a very high threshold for extreme and outrageous conduct.  "The conduct at issue 'must transcend the bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community." *Margrabe*, 353 Fed. Appx. at 550 (quoting *Klinge v. Ithaca Coll.*, 235 A.D.2d 724, 727 (3d Dep't 1997)).  To survive a motion to dismiss, "[t]he conduct alleged must be such that it can be fairly characterized as egregious, utterly despicable, heartless or flagrant." *Lydeatte v. Bronx Overall Econ. Dev. Corp.*, No. 00CIV5433, 2001 WL 180055, *2 (S.D.N.Y. Feb. 22, 2001).  A claim for the intentional infliction of emotion distress is "rigorous, and difficult to satisfy."  *Howell*, 81 N.Y.2d at 122 (citations omitted).

*1. Compliance with Notice of Claim Requirements*

Defendants argue that Plaintiffs' IIED claims must be dismissed for failure to comply with New York State General Municipal Law Section 50-e ("Section 50-e").  *See* Dkt. No. 13.  Specifically, Defendants argue that Plaintiffs failed to file a notice of claim with respect to its claims against Defendants City and Chamberlain in his official capacity.  *See id.* at 14.  Plaintiffs

13

argue that a letter sent to Defendant Matzke in September 2018, is sufficient to satisfy Section 50-e. *See* Dkt. No. 15 at 10-11. Defendants contend that this letter was not intended to be a notice of claim and even if it had been so intended, it did not comply with requirements of Section 50-e(2). *See* Dkt. No. 9 at 14.

As a general rule, "state notice-of-claim statutes apply to state-law claims" asserted as pendant claims in a federal action. *Hardy v. NYC Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999) (citing *Felder v. Casey*, 487 U.S. 131, 151 (1988); *Fincher v. Cnty. of Westchester*, 979 F. Supp. 989, 1002 (S.D.N.Y. 1997) (noting that New York's 90-day notice-of-claim requirement applies to state tort claims brought as pendent claims in a federal action)). "Pursuant to New York General Municipal Law § 50-e, a plaintiff who asserts a state law tort claim against a municipal entity or its employees for acts that occurred within the scope of their employment must file a notice of claim within ninety days after the incident giving rise to the claim." *Maier v. New York City Police Dep't*, No. 08-CV-5104, 2009 WL 2915211, *3 (E.D.N.Y. Sept. 1, 2009). "Notice of claim requirements are construed strictly by New York state courts. Failure to comply with these requirements ordinarily requires a dismissal for failure to state a cause of action." *Hardy*, 164 F.3d at 793–94.

In order to survive a motion to dismiss, a plaintiff "must plead that: (1) a notice of claim was served; (2) at least thirty days elapsed since the notice of claim was filed and before the complaint was filed; and (3) in that time, the defendant neglected to or refused to adjust or satisfy the claim." *Coggins v. Cnty. of Nassau*, 988 F. Supp. 2d 231, 251 (E.D.N.Y. 2013). "The plaintiff bears the burden of demonstrating compliance with the notice of claim requirement." *Chabot v. Cnty. of Rockland, New York*, No. 18-CV-4109, 2019 WL 3338319, *9 (S.D.N.Y. July 25, 2019).

On September 4, 2018, Plaintiffs, without the assistance of counsel, sent a letter to Defendant Matzke detailing their belief that they had been subjected to a number of violations by members of the local government. *See* Dkt. No. 2 at 19-21. Plaintiffs argue that the letter should be construed as a sufficient notice of claim because of their *pro se* status at the time. *See* Dkt. No. 15 at 11. Plaintiffs characterize the error as a defect that was made in good faith. *See id.* However, at the end of this letter, Plaintiffs stated "[i]f these matters are not resolved immediately to our satisfaction, we are considering filing a Notice of Claim against the City of Oneida." *See* Dkt. No. 2 at 21. This contradicts Plaintiffs' characterizations of the letter. In fact, it demonstrates that Plaintiffs were aware of the requirement for a notice of claim, and that the letter was not intended to be a notice of claim. Because there is no indication that Plaintiffs ever filed a notice of claim against Defendants City or Chamberlain, they have not complied with the requirements of Section 50-e. Accordingly, Plaintiffs IIED claim against Defendant City is dismissed.[2]

Plaintiffs argue that their IIED claim against Defendant Chamberlain in his official capacity must survive because the notice of claim requirements are not applicable to Defendant Chamberlain. *See* Dkt. No. 15 at 12. Section 50-e(1)(b) states as follows:

> Service of the notice of claim upon an . . . employee of a public corporation shall not be a condition precedent to the commencement of an action or special proceeding against such person. If an action or special proceeding is commenced against such person, but not against the public corporation, service of the notice of claim upon the public corporation shall be required only if the corporation has a statutory obligation to indemnify such person under this chapter or any other provision of law.

---

[2] Alternatively, Plaintiffs' IIED claim against Defendant City must be dismissed because it is well-settled that "[p]ursuant to new York law, 'public policy bars claims for intentional infliction of emotional distress against a government entity.'" *Frederique v. Cnt. of Nassau*, 168 F. Supp. 3d 455, 483 (E.D.N.Y. 2016) (quotation and other citations omitted).

Gen. Mun. Law § 50-e(1)(b). The city must indemnify the employee if "the act or omission . . . occurred while the employee was acting within the scope of his public employment and in the discharge of his duties and was not in violation of any rule or regulation of his agency at the time the alleged damages were sustained." Gen. Mun. Law § 50-k(3). However, "the duty to indemnify . . . shall not arise where the injury or damage resulted from intentional wrongdoing or recklessness on the part of the employee." *Id.*

Here, Plaintiffs' IIED claim against Defendant Chamberlain alleges intentional wrongdoing for which he would not be indemnified by the city. *See id.*; *see also Bradshaw v. City of New York*, No. 17-CV-1199, 2017 WL 6060781, *18 (S.D.N.Y. Dec. 7, 2017) (collecting cases). Plaintiffs allege that Defendant Chamberlain engaged in the following extreme and outrageous conduct: "making complaints against the Plaintiffs[,] directing City employees to target Plaintiffs[,] and taking steps to modify the City's Code to make Plaintiffs' legal conduct illegal." *See* Dkt. No. 2 at ¶ 82. Plaintiffs allege that Defendant Chamberlain also allowed a notice of violation to be sent to Plaintiffs. *See id.* at ¶ 83. If the allegations are taken as true, the intentional misconduct would vitiate the need for a notice of claim against Defendant Chamberlain. *See Wolongevicz v. Town of Manlius*, No. 5:17-CV-933, 2018 WL 3769857, *12 (N.D.N.Y. Aug. 8, 2018) (collecting cases). Regardless, Plaintiffs' IIED claims against Defendants City and Chamberlain must be dismissed as untimely.

### 2. Timeliness of Claim

Defendants argue that Plaintiffs' IIED claims must be dismissed as time-barred. *See* Dkt. No. 9 at 13. Defendants argue that more than one year passed between the conduct alleged, which occurred in July 2018, and the filing of this action on October 30, 2019. *See id.* at 15-16.

Plaintiffs argue that their IIED claim did not accrue until after March 26, 2019, the date when Plaintiffs learned of Defendants' conduct and their damages manifested. *See* Dkt. No. 15 at 13-14.

Pursuant to New York Civil Practice Law and Rules Section 215, the statute of limitations for a cause of action for the intentional infliction of emotional distress is one year. *See* N.Y.C.P.L.R. § 215(3); *Goldner v. Sullivan, Gough, Skipworth, Summers & Smith*, 105 A.D.2d 1149, 1151 (4th Dep't 1984). "Generally, under New York law, '"despite the general principle that a cause of action accrues when the wrong is done, regardless of when it is discovered, certain wrongs are considered to be continuous wrongs, and the statute of limitations, therefore, runs from the commission of the last wrongful act."'" *Neufeld v. Neufeld*, 910 F. Supp. 977, 982 (S.D.N.Y. 1996) (quoting *Leonhard v. United States*, 633 F.2d 599, 613 (2d Cir. 1980), *cert. denied*, 451 U.S. 908 (1981)) (other citation omitted).

Here, the last allegedly wrongful acts occurred in July 2018. *See* Dkt. No. 2 at ¶¶ 67-90. Even if the continuing harm doctrine did apply, the statute of limitations for Plaintiffs' IIED claim began to run from the "commission of the last wrongful act[,]" in July 2018. *See Neufeld*, 910 F. Supp. at 982 (quotation and other citations omitted). Because Plaintiffs did not file this action until October 30, 2019, their claims are time-barred. Accordingly, Defendants' motion to dismiss Plaintiffs' IIED claims against Defendants City and Chamberlain is granted.

E.     **Plaintiffs' Alternative Request to Amend the Complaint**

Finally, Plaintiffs seek an opportunity to amend their complaint as an alternative to dismissal. *See* Dkt. No. 15 at 15. According to Rule 15 of the Federal Rules of Civil Procedure, when unable to amend as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Local Rule 7.1(a)(4) states that "[a] party moving to amend a pleading . . . must attach an unsigned copy of

the proposed amended pleading to its motion papers.  *See* N.D.N.Y. Local Rule 7.1(a)(4).  Additionally, unless otherwise stated, all motions require a memorandum of law detailing the reasons why the party believes their motion should be granted.  *See* N.D.N.Y. Local Rule 7.1(a)(1).

Here, Plaintiffs have not provided a proposed amended complaint nor have they provided a memorandum detailing why they should be permitted to amend their complaint.  In fact, Plaintiffs have not even provided any reason at all for why they should be permitted to amend their complaint.  *See* Dkt. No. 15 at 15.  Additionally, Rule 2(A)(ii) of the Individual Rules and Practices of the Hon. Mae A. D'Agostino provides as follows: "Motions to dismiss and for judgment on the pleadings in civil cases will be decided "**with prejudice**" where the opposing party has been given the opportunity to amend the pleadings after receiving the moving party's pre-motion letter."  Plaintiffs failed to take the opportunity to amend their pleading when served with the Defendants' pre-motion letter.  Due to Plaintiffs' failure to comply with the rules of this District, including their failure to file a proposed amended complaint, their request to amend the complaint is denied.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's Motion to Dismiss (Dkt. No. 9) is **GRANTED in part and DENIED in part**;[3] and the Court further

**ORDERS** that Defendant Matzke be **DISMISSED** from this action; and the Court further

---

[3] As a result of this Memorandum-Decision and Order, the only surviving claim is Plaintiff Kyle Endemann's First Amendment claim against Defendants City and Chamberlain.

18

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: April 6, 2020
      Albany, New York

Mae A. D'Agostino
U.S. District Judge